ELIZA BABCOCK, as Administratrix, etc.; Respondent, *v.* THE FITCHBURG RAILROAD COMPANY, Appellant.

B., plaintiff's intestate, was killed by the explosion of a powder house alleged to have been caused by sparks escaping from one of defendant's engines.   In an action to recover damages, the negligence charged was in not using the safest engines, *i. e.*, those the best calculated to prevent the escape of sparks.   These facts appeared·   The engine and its appliances were in perfect condition ; it was of a kind formerly in general use.   The mill had been in the same location for many years, and defendant's road had been operated since 1876 with the same kind of locomotives, without causing injury to the mill.   Another kind had come into general use, .but there was no proof showing that they were safer or less likely to cause fire ; it simply showed that they emitted fewer but larger sparks. The new kind was brought into use, not because they were considered safer, but because of greater efficiency and of economy in the use of fuel.   *Held* (ANDREWS, Ch. J., O'BRIEN and MAYNARD, JJ., dissenting), that the evidence failed to show negligence on defendant's part and so was insufficient to sustain a verdict for plaintiff.

*Babcock* v. *Fitchburg R. R, Co.* (67 Hun, 469), reversed.

(Argued October 13, 1893; decided December 5, 1893.)

APPEAL from judgment of the General Term of the Supreme Court in the third judicial department, entered upon an order made February 15, 1893, which affirmed a judgment in favor of plaintiff entered upon a verdict and affirmed an order denying a motion for a new trial.

This action was brought to recover damages for the death of Frederick Bennett, plaintiff's intestate, which was alleged to have been caused by defendant's negligence.

The facts, so far as material, are stated in the opinion.

*T. F. Hamilton* for appellant.   There was not sufficient evidence that the sparks from defendant's locomotive caused the explosion. (*McCaig* v. *E. R. Co.*, 8 Hun, 599; *Field* v. *N. Y. C. R. R. Co.*, 32 N. Y. 329; *Rood* v. *N. Y. & E. R. R. Co.*, 18 Barb. 80; *Webb* v. *R., W. & O. R. R. Co.*, 49 N. Y. 422.)   A railroad company is not liable for fires caused by the escape of sparks, where its spark arrester is in perfect condition.   (*Collins* v. *N. Y. C. & H. R. R. R. Co.*, 12 Hun, 503.)

*Martin I. Townsend* for respondent.   There was evidence enough before the court to justify the submission to the jury of the question whether the sparks from the defendant's engine caused the explosion which destroyed the life of the intestate, Frederick Bennett. (*Sheldon* v. *H. R. R. R. Co.*, 14 N. Y. 218; *Rood* v. *N. Y. E. R. R. Co.*, 18 Barb. 80; *Hinds* v. *Barton*, 25 N. Y. 544; *Flynn* v. *N. Y. C. & H. R. R. R. Co.*, 67 Hun, 631.)   It was proper for the court to submit to the jury the question whether, in their opinion, the defendant was guilty of negligence in not having provided and used the improved form of engine for drawing its train on the occasion when this misfortune occurred. (*Flynn* v. *N. Y. C. & H. R. R. R. Co.*, 67 Hun, 631; *Steinweg* v. *E. R. Co.*, 43 N. Y. 126; *Hegeman* v. *W. R. R. Co.*, 13 id. 9; *Bevier* v. *D. & H. C. Co.*, 13 Hun, 254; *Freemantle* v. *L. & N. W. R. Co.*, 10 C. B. [N. S.] 89.)   The plaintiff's intestate was not guilty of contributory negligence in working in this mill. (*Cook* v. *C. T. Co.*, 1 Den. 91.)

EARL, J.   The plaintiff's intestate, Fred Bennett, was killed on the 15th day of October, 1889, by the explosion of a powder mill, and the claim of the plaintiff is that the explosion was caused by sparks which escaped from the smoke stack of one of the defendant's locomotives because it had not adopted suitable appliances to prevent the escape of the sparks.

The mill was nearly two hundred feet from the railroad track, and the locomotive was drawing a heavy train of cars

upon an ascending grade, emitting large volumes of smoke, which was carried by the wind then blowing towards the mill, and as the smoke settled down over the mill the explosion occurred, wrecking the mill, into which the intestate had just entered.

The mill had been in the same location for many years, and the railroad had been operated since the year 1876 with the same kind of locomotives, without causing any injury to the mill.

The mill was a wooden building twenty feet square, one story high, covered with tin and painted with fire-proof paint. There were no openings in the building on the side towards the railroad, and all the openings therein were kept closed except when the person working in the mill opened them. The mill was in operation only about six months each year at intervals as there was business for it.

The first question for the determination of the jury was whether the sparks from the locomotive caused the explosion. The sole evidence bearing upon this question is that Bennett was seen to enter the building a few moments before the explosion, and that the locomotive was approaching emitting the smoke which was carried to and over the building, and as it settled down over the same the explosion occurred. Bennett was the only person in the building, and it does not appear what he was doing at the time. There is no evidence that any of the windows or doors of the building were open, or that there was then any occasion for having them open, or that there was any crevice or opening through which sparks could enter the building. Persons looking on from a distance saw the smoke, but no witness saw any sparks or cinders. It seems that powder mills are liable to explosion from defects in machinery or the carelessness of men, as mills near this place had exploded twelve or fifteen times in previous years, averaging a death of a human being at each explosion. Under such circumstances, how could the jury find the cause of this explosion? The smoke settled down upon the building at the time, and Bennett entered the building a few moments before.

There was the coincidence of the smoke settling down and the explosion, and also the coincidence of Bennett's entry into the building and the explosion. What caused the explosion, the sparks in the smoke or some act of Bennett? The jury might guess it was one or the other, and one guess might be more probable than the other, and still it would be a mere guess. There may be moral evidence quite convincing and sufficient to influence the conduct of men in some of the ordinary affairs of daily life which yet does not rise to the standard of legal evidence for the consideration of a legal tribunal, and sufficient to form the basis of judicial action. (*McLoghlin* v. *National Mohawk Valley Bank*, 139 N. Y. 514.)

If there had been evidence that the explosion could have been caused only by fire passing or brought into the building from the outside, then there would have been some basis for the verdict. But there was no such evidence, and we know there could be none. If the natural tendency of the operation of the defendant's railroad was to endanger this mill by the sparks emitted from its locomotives, the case would be different. But the locomotives on this road had been operated for thirteen years, under all conditions, in all kinds of weather, carrying long and short trains, and yet the powder mill had never been destroyed.

The plaintiff was bound to show that the explosion was not caused by the carelessness of Bennett, and that it was caused solely by the fault of the defendant. It cannot be presumed that he was free from carelessness; and the burden was upon the plaintiff in some way to prove it. (*Weston* v. *City of Troy*, 139 N. Y. 281.)

Verdicts must stand upon evidence and not upon mere conjecture, however plausible, and if the situation be such that the plaintiff cannot furnish the requisite evidence the misfortune is his. We think the plaintiff failed in this branch of her case. But she failed still more signally in another branch of it.

The engine which is charged with this explosion was a diamond stack, and it was such as had been prior to about the

year 1879, in universal use upon railroads in this country. About that time extension front engines began to come into use, and in 1889, at the time of this accident, there is evi-dence tending to show that they were coming into general use.  In a diamond stack engine the cinders pass through the flues into the smoke box and then are carried by the exhaust steam up the smoke stack against an inverted cone which acts as a deflector; and as they are deflected they are thrown up again and again until they are rendered quite small, when most of them are thrown through the wire netting across the smoke stack above the inverted cone.  This netting has four meshes to the square inch.  By the operation of the deflector the tendency is to throw the sparks out of the smoke stack to the sides of the road.  In an extension front engine there is a large smoke box extending in front of the smoke stack into which the largest share of the sparks are thrown.  There they are agitated by the steam and some of them are thrown out of the smoke stack through a wire netting which has from two to two and a half meshes to the square inch.  The sparks which pass into the smoke box accumulate there in large quanti-ties and are from time to time when the engine stops removed. Fewer sparks are emitted from the extension front engines, but they are larger, and from such engines the sparks are thrown directly upwards.  No witness testified that the extension front engines were safer or less liable to set fires than the diamond stack.  The only fact from which any inference can be drawn as to the comparative safety of the two engines is that in the dia-mond stack engines more sparks are emitted, but they are smaller.  The plaintiff seeks to charge the defendant with negli-gence solely upon the ground that it continued to use the dia-mond stack engines, and had not converted them into extension fronts, the proof showing that the engine in question was in per-fect condition, and that all the appliances of the diamond stack were in perfect order.  To maintain her action she was bound at least to show that the extension front engines were safer and less liable to cause fires along the railroad than the diamond stack.  This, we think, she failed to do.  She could

have proved, if her claim be well founded, by firemen, engineers, railroad superintendents and mechanics that in the operation of railroads the extension front engines are less liable to cause fires than the diamond stack engines. Upon this point there must be much experience and observation among railroad men, and there should be some proof upon the subject from which a jury could find the facts in reference to the comparative safety of the two kinds of engines.

But still further; there is no proof in this case that the extension front engine was invented or brought into use because it is safer or less liable to set fires than the diamond stack. All the witnesses who spoke upon the subject testified that the purpose of the extension front was to make the engine more efficient by giving more draft, and for economy in the use of coal.

We will briefly call attention to some of the evidence. One of the plaintiff's witnesses testified that he had noticed "the coming out of sparks of the extension front engines and diamond stack engines many times." Another witness testified that "railroad managers are altering some of the old style engines into the extension smoke box for the very object of obtaining more area of netting. The purpose of this is to get a better draft through the flues;" that "the purpose of this greater area of netting in the extension front is to produce a better draft;" that "an extension front, by breaking up the coals and cinders, reduces their size so as to force them through the netting, depending upon the mesh of the netting altogether;" that "there is no difference between the throwing of sparks by the diamond stack engines and the throwing of sparks by the extension front engines, if the netting is intact and sound. There is no difference as to the quantity that will be thrown;" that "there is no reservoir in the extension front to hold the sparks for any length of time. There is considerable more space in an extension front to hold the sparks than in an ordinary smoke box, probably double the quantity it will hold. As soon as it gets filled up to a certain extent it empties itself. It has got to thresh it through the

netting to get out;" that "it breaks them up as it goes through the netting." Another witness of the plaintiff testifies that the difference between the two kinds of engines is that "the sparks do not go out so much from the extension front as they do from the old style diamond stack. I have seen good-sized ones come out of an extension front the same as I have from a diamond stack, but not so many. * * * Some of these sparks in the extension front engine that do not remain in the engine go out. All go out that can get through the netting. The spark that goes out depends upon the size of the netting." Another witness for the plaintiff testified that "in the extension front the sparks and cinders that are not deposited in the machines go out of the stack, and the size of the spark depends upon the size of the mesh in the netting." A witness for the defendant testified that "the extension front is simply an elongation of the ordinary smoke box, partially designed for more draft. That is partly done to secure more draft. It is done for economy of repairs and economy of fuel;" that "the economy I speak of was through a saving of fuel. We don't burn as much fuel in an extension front engine as we do in the other. I think that is a well-accepted theory, and has been known to be such for some years;" that "most of the cinders, coal and ashes that pass into this extension front is not worked up directly by that exhaust, but drawn up by induction through the netting after working out and churning around in this front. Then they are caught by the exhaust and thrown up pretty straight and high;" that "I have seen more cinders taken from the diamond stack engines than extension front engines. The ordinary smoke box in the diamond stack holds dead cinders." Another witness for the defendant testified: "I understand the purpose of the extension front to be to save coal, for one thing; it is lighter on the fire. It saves coal by not being so hard on the fire. It is lighter on the fire. There is a longer pull for a fire to get around, and isn't so direct."

We, therefore, are unable to perceive how it was possible for the jury, upon the evidence, to find that the extension

front engine is safer than the diamond stack, or that this accident would probably not have occurred if the extension front engine had been used rather than the diamond stack.

Our conclusion, therefore, is that the judgment should be reversed and a new trial granted, costs to abide the event.

O'BRIEN, J. (dissenting). The plaintiff has recovered damages against the defendant for causing the death of her son and intestate on the 15th of October, 1889. The deceased was at work in one of the mills of the Schaghticoke Powder Company, which was blown up, as is claimed, by a spark from one of the defendant's engines, thus causing his death. The mill in which the deceased was at work was situated on the northerly bank of the Hoosick river and about one hundred and ninety-five feet from the track of the defendant's road. The testimony tended to show that a freight train, composed of some twenty-two cars, was approaching in the direction of the mill, laboring hard upon an ascending grade, the stack of the engine emitting volumes of black smoke, which was carried by the wind towards the mill, over and around which it settled in what is described as a dense mass. When the train reached a point opposite the mill an explosion took place which utterly destroyed the building and plaintiff's intestate was instantly killed. The fact that the fire was communicated from the defendant's engine to the mill rests wholly upon circumstantial evidence, but it was of such a character as to warrant the jury in finding that the explosion was produced by sparks from the defendant's engine. It was shown that the train was laboring against an ascending grade of about thirty feet to the mile, requiring the frequent use of fresh coal, which was applied by the fireman, in order to furnish the necessary steam, the emission of thick smoke from the stack in unusual quantities was described, the direction of the wind was favorable, and when the smoke was seen to settle over the mill the explosion took place, and no other cause for the accident was discernible or even suggested. The screen

of the smoke stack was so constructed as to emit sparks and burning coals of considerable size which could have reached the building from the engine through the wind and smoke.

It is sufficient to say, without further reference to the testimony on this branch of the case, that the origin of the fire which produced the explosion presented a fair question of fact for the jury upon all the facts and circumstances of the case, and we are concluded by the finding and must assume, as the jury have found, that the explosion was caused by a spark from the defendant's engine. But the defendant was engaged in using fire to propel cars by steam, under the sanction and authority of law, and it is not liable for any damage resulting from its use unless it was guilty of negligence. It was the duty of the defendant to use every reasonable precaution to prevent the injury, and unless we can say, as matter of law, upon the evidence, that it has performed this duty, then the verdict must stand.

The defendant was intrusted by the legislature with an agent for propelling its trains of an extremely dangerous character, and the law imposes upon it the duty of observing due care which must always be measured by the degree of danger or the risk incident to the exercise of its powers. When it neglects or fails to adopt and use such precautions as may reasonably be expected, under all the circumstances, to prevent injury to the person or to the property of others, it becomes liable for the resulting damages.

It is urged in behalf of the plaintiff that the engine which the defendant used on the occasion, and which produced the accident, was so constructed as not to properly guard and control the sparks and cinders arising from the fires, and in this respect it omitted to perform the duty which the law imposed upon it of adopting every reasonable precaution against injury. The engine was what is known as the diamond stack engine, which is so constructed that the particles of burning coal, set free from the mass, are driven by the air and the power of the exhaust steam against the netting or screen, upon the top of the smoke stack, until eventually they are forced into the

air, and in this way coals and sparks of sufficient size to communicate fire to combustible matter in the vicinity, are frequently emitted from the engine. At the time of this accident there had been another engine in general and common use upon railroads known as the extension front engine, which was so constructed that no particle of burning coal or other fire is driven in the first instance against the netting, but against a metallic diaphragm in front of the fire, and never comes within the sweep of the exhaust steam, but falls into a vault or box at the foot of the stack, from which it is removed as occasion may require. There can be no doubt upon the evidence that by the use of this class of engines upon railroads the danger of communicating fire to buildings or property in the vicinity is very materially diminished. The evidence tended to show that these engines had been in general use since 1879 at least, by the great railroads of the country, and that the diamond stack engines were turned into use in the yards as shifters. That the defendant had in use eight or ten of the former at the time of the accident, as against about twenty-five of the latter. The extension front not only greatly diminished the risk of fires, but it saved fuel, so that in the end it might be economy to adopt them. Assuming that the engine which the defendant had in use on the occasion of this accident was, when first adopted, suitable for the purpose or at least as safe as any then in use, the question arises with respect to its duty to the public to adopt safer and better appliances as they came into general use from time to time. The duty which the defendant owed to the public could not be discharged by adopting the new and safer appliances only when and as fast as the old and defective ones became worn out or otherwise useless. A railroad corporation, charged with such important duties to the public, does not exercise that degree of prudence and reasonable care which the law imposes upon it, for the protection of life and property, unless, in its appliances and mode of operation, it keeps pace with human progress, and brings to its aid in every proper and reasonable way the improvements which science

and human invention have placed within its reach. When new methods of preventing or minimizing the danger have been introduced, and are in general use for a reasonable time, prudent management and reasonable care require the corporation to take notice of that fact, and its use thereafter of old, inferior or defective appliances may constitute evidence of negligence.

The measure of duty imposed by the law upon the defendant was thus stated by Judge FOLGER in *Steinweg* v. *Erie Railway* (43 N. Y. 123): "The rule of law is that the appellant was guilty of negligence if it adopted not the most approved modes of construction of machinery in known use in the business, and the best precautions in known practical use for securing safety. If there was known and in use any apparatus which, applied to an engine, would enable it to consume its own sparks, and thus prevent the emission of them to the consequent ignition of combustible property in the appellant's charge, it is negligent if it did not avail itself of such apparatus. But it was not bound to use every possible invention which the highest scientific skill might have suggested, nor to adopt an untried machine or mode of construction."

In that case, goods intrusted to the railroad, as a common carrier, were destroyed by fire communicated by a spark from the engine. The contract under which the corporation undertook to transport the property released it "from damage or loss to any article from or by fire or explosion of any kind." The court held, however, that this did not exempt the carrier from liability for loss by fire caused by its own negligence. The case turned, not upon any peculiar duty or obligation resting upon the railroad, or growing out of its contract, as a common carrier, but solely upon the question of negligence in omitting to adopt any known appliances in practical use which would enable an engine to consume its own sparks. The defendant in that case had been released from the special and peculiar obligations of a common carrier, and its liability for the destruction of the goods left to depend upon proof of its

neglect to perform the general duty which it owed to the whole public of providing reasonably safe appliances for the conduct of its business. The principle, therefore, applies to the case at bar, and it has been applied in other cases where recoveries have been had against railroads for causing fires upon lands, or to buildings, fences and property of a like character upon the line of its operation by means of sparks or burning coals emitted from engines. (*Freemantle* v. *London & N. W. R.*, 10 C. B. [N. S.] 89; *Crist* v. *Erie Railway Co.*, 58 N. Y. 638; *Bedell* v. *L. I. R. R. Co.*, 44 id. 367; *Webb* v. *R., W. & O. R. R. Co.*, 49 id. 420; *Searles* v. *Manhattan Railway Co.*, 101 id. 661; *O'Neill* v. *N. Y., O. & W. R. Co.*, 115 id. 579; *Flinn* v. *N. Y. C. & H. R. R. R. Co.*, 67 Hun, 631; *Bevier* v. *D. & H. C. Co.*, 13 id. 254.)

In *Searles* v. *Manhattan Railway Co.* (*supra*), the plaintiff recovered for an injury to his eye caused by a hot cinder which fell from one of the defendant's locomotives. The judgment was reversed in this court upon the opinion of Judge EARL, for the reason stated that "the undisputed evidence shows that all the appliances used upon the defendant's locomotives to prevent the escape of sparks and cinders were skillfully made and were the *best known*," thus recognizing the principle. In *O'Neill* v. *N. Y., O. & W. Railway Co.* (*supra*), the plaintiff recovered damages caused by sparks communicated to woodlands from the defendant's engines. The judgment was affirmed in this court. One of the questions submitted to the jury was "whether the engine was supplied with the most approved method of arresting sparks in *known use*." The liability of the defendant in case it was not was conceded in the motion for a non-suit and in the disposition made of the case in this court. In all these cases the proof with respect to negligence was much weaker, in my opinion, than that presented by this record.

A railroad company, in the construction and equipment of its engines, is bound not only to employ all due care and skill for the prevention of injury to the person or property of

others by the emission of sparks, burning cinders or other cause, but it must avail itself of all discoveries which science or invention has placed within its reach for that purpose, provided they are such as, under the circumstances, it is reasonable to require it to adopt. But when the dangers to be avoided are insignificant, or not very likely to occur, and the remedy suggested very costly and troublesome, or such as interferes materially with the efficient working of the engine, it becomes a question for the jury whether, under all the circumstances, the company could reasonably be expected to adopt it. (Am. & Eng. Ency. of Law, vol. 8, p. 3, 4.)

In this case the learned trial judge submitted two questions to the jury. First, whether from the testimony the explosion was produced by sparks or burning cinders from defendant's engine entering the building through an open door or window and coming in contact with the powder, and, secondly, whether the defendant exercised due care and caution in running its trains with an engine so constructed as to emit sparks, when a better and safer one was attainable and in general use, not only upon its own road but others generally throughout the country. On the last question the jury were instructed that the defendant was not bound to use such appliances as the highest scientific skill can devise, yet it was bound to use such approved methods as had been adopted in the business, which were reasonably attainable by the company and in general use, as to afford proper security to the lives and property of others. The jury were fully informed by the proofs as to the comparative merits and safety of the two engines, the danger of communicating fire to combustible matter on the line of the road, the time that the extension front engine had been in general use, the saving in the use of fuel and the additional expense involved in the change. In this state of the case the question whether the defendant did or did not perform the duty imposed upon it was not a question of law but one of fact for the jury, and as it has been determined upon sufficient evidence in favor of the plaintiff this court cannot disturb the verdict. The other exceptions in the record have been

examined, and as they do not disclose any legal error the judgment should be affirmed.

Finch and Gray, JJ., concur with Earl, J., for reversal. Peckham, J., concurs with Earl, J., on second ground, and dissents from first ground of opinion.

Andrews, Ch. J., and Maynard, J., concur with O'Brien, J., for affirmance.

Judgment reversed. _____