(55 App. Div. 49.)

## CRAIG v. LAFLIN & RAND POWDER CO.

(Supreme Court, Appellate Division, Second Department. November 23, 1900.)

MASTER AND SERVANT—NEGLIGENCE—DEATH OF SERVANT—ALTERNATIVE CAUSES —MASTER'S LIABILITY.

    Plaintiff's intestate was killed by an explosion at defendant's powder factory. There were two explosions, in one or the other of which the mixing house, the adjoining assembly room, a well where nitroglycerin was kept, and two gun-cotton dry houses were destroyed. It was not shown what was included in either explosion, except that the origin was in the mixing house, nor was it shown in which explosion, or by what direct means, deceased was killed. It was conceded that, if deceased was killed as a result of the explosion of the mixing house, there could be no recovery, he having assumed that risk. Held, that a verdict for plaintiff could not be sustained, since where there was nothing to show whether deceased was killed by an accident for which defendant was liable, or by one for which it was not, there could be no recovery.

Appeal from trial term, Kings county.

Action by Elizabeth Craig as administratrix of John Craig, deceased, against the Laflin & Rand Powder Company. From a judgment in favor of plaintiff, defendant appeals. Reversed.

Argued before GOODRICH, P. J., and BARTLETT, WOODWARD, HIRSCHBERG, and JENKS, JJ.

William P. Chambers, for appellant.
Charles F. Brown (John T. Little, on the brief), for respondent.

HIRSCHBERG, J. The plaintiff's decedent, her husband, was killed by an explosion on the 3d of July, 1898, which wrecked the smokeless-powder plant of the defendant located at Pompton, in the state of New Jersey. He was the engineer of the plant, and had been employed in that capacity since the previous May. He was informed at the time of his employment of the dangerous nature of the occupation, and in the month of June stated to the superin-

tendent that he had been thinking of leaving because he thought the work dangerous, but had concluded to stay in consequence of an increase in his pay. His duties involved the general supervision of all the power machinery, engine, dynamos, boiler, motors, etc. The explosion occurred in the course of manufacture, and undoubtedly originated in one of the mixing houses, where the initial and most dangerous step in the process was in progress, viz. that of mixing certain highly explosive materials and chemicals in iron vessels or "mixers." The operatives, in accordance with a practice which had prevailed for some years without an accident, after placing the necessary materials in the mixers, left the mixing house, and retired behind a wall, where a button was pressed which served electrically to start the machinery. This wall was 12 feet high, 180 feet long, 4 feet thick at its base, and 3 feet at the top. It shielded the mixing house and an assembly room adjoining it, and at the time of the accident men were engaged in digging a trench with a view of its extension. During the time the men were stationed behind the wall it was customary to expose danger signals, and that was done on the occasion in question. The witnesses agree that an explosion is chiefly, if not solely, to be apprehended during the first 10 minutes of the mixing process. If none occurs during that period, the men return to the mixing house, and remain there at work until the commencement of another mixing requires them to again station themselves outside, and behind the protecting wall. The mixing process was repeated hourly. On the day in question, a moment or two after starting the machinery, an explosion occurred, presumably in the mixing house, followed by another, probably caused by the first detonation. The interval between the two explosions must have been very brief. A witness for the plaintiff said: "The time between the explosions was not much. Only time to get on my knees, and I was knocked down again. I had not got all the way up." At the time of the explosions the plaintiff's intestate was standing under or by a tree, about 10 feet from, and at the northerly end of, the wall, opposite the end of the assembly room furthest from the mixing house. No one saw him killed. Part of his jaw was off, and he was partly disemboweled, but by what precise means or violence does not appear. About 10 feet of the end of the wall opposite where he stood was blown down, and the stones blown over, and he may have been struck by the débris, but the fact, if it be a fact, was not proven.

The assembly room was about five feet distant from the mixing house, and they were joined together by a closed passageway, a shingle roof, and inclosed sides. About 80 feet from the assembly room was a well or nitroglycerin box in the ground or against a bank, and at least 100 feet further was a gun-cotton dry house. Another gun-cotton dry house was at about the same distance from the mixing and assembly houses, but in a different direction. In the assembly house, the well, and the gun-cotton dry houses were stored at the time quantities of explosive material, which it may be fairly assumed were exploded because of the explosion in the mixing house, and because of their propinquity. At all events,

after the explosions it was found that the mixing house, the assembly house, the nitroglycerin well, and the two gun-cotton dry houses had all exploded, and other buildings on the property were burned up. The two gun-cotton dry houses were used for the storage of the principal stock of explosives, the nitroglycerin well as an intermediate storage place for a much smaller quantity, and in the assembly house was kept, for convenience, a still smaller supply, to be used in the hourly mixings.

It was conceded that the plaintiff could not recover if the deceased was killed by the first explosion, but the case was tried and submitted to the jury upon the theory that there could be a recovery if he was killed by the second explosion. The plaintiff's claim appears to have been that the second explosion involved the destruction of the nitroglycerin well, and that it was the explosion of that well which killed the deceased. The negligence charged in the complaint is "the defective and improper construction, grouping, and equipment of the buildings and outhouses" belonging to the defendant, and the specification upon the trial chiefly related to the storing of explosives so near to the mixing house that an explosion in that house would be likely to extend to the others. The learned trial justice charged the jury as follows:

"She claims that the circumstances of the accident, the extent of the injury done, the location of her husband at the time of the explosion of the well with its contents, and all the surroundings indicated a second explosion, which is claimed to be the well explosion, which injured him; that but for such storing of the nitroglycerin and gun cotton he would have escaped injury, even if the mixer had exploded, as he was protected, as they claim, by the wall, against the mixer explosion. The claim of the defendant is that there is no satisfactory proof of any negligence on the part of the defendant; that there is no satisfactory proof that points to the injury as the result of the well explosion as distinguished from the mixer explosion. I think you understand that, if the death was caused by the mixer explosion alone, there can be no recovery, because, if the storage of the explosives too near the mixer had nothing to do with the injury to her husband, the plaintiff has no cause of action; that her claim is, it was because of the nearness of one set of explosives to another, without any necessity for their being so placed, and that that neglect and carelessness caused the fatal result,—that nearness, without any barriers between."

Assuming that the defendant would be liable to an employé for injuries which could be proven to have been occasioned solely by the second explosion,—but, of course, without deciding it,—I find no sufficient proof that the decedent's death was so occasioned. If he was killed by the falling of the wall, of which there is no direct proof, there is nothing to indicate that the wall was thrown down by the second explosion. The case appears to have been tried on the theory that both the mixing and the assembly houses were destroyed in the first explosion, in which event the injury to the wall would be a probable result of such explosion, and there is no evidence indicating the contrary. There is no evidence establishing any weakness or defect in the wall itself, and none, other than the accident, tending to prove that it was not entirely adequate for the purpose for which it was constructed. The portion destroyed may have been blown over by the force of the first explo-

sion without involving any liability on the part of the defendant; for there was not only no evidence of negligence in the construction of the wall, but there was also no evidence of the cause of the explosion, and certainly none in any way involving negligence in the construction of the mixing machine, the method of charging it, or the manner of operating it. The first explosion was treated at the trial as if a usual and unavoidable risk of the occupation, and no attempt was made to explain the occurrence. It was conceded that it created no right of action.

In their principal brief the learned counsel for the respondent say:

"It is unnecessary to consider which caused the death of the deceased,—whether the blowing down of the wall or the direct force of the explosion from the nitroglycerin well. In either event, it was the force of the aggregate explosion and not the initial explosion in the mixer. It was the combined force of the explosion in the assembly room and nitroglycerin well, or the nitroglycerin well, and for either of said explosions the defendant's negligence was a clear question for the jury."

A sufficient answer to this suggestion is to be found in the fact that there is no proof that the explosion in the assembly room was not a part of the first explosion. The mixing and assembly houses were practically one, and there is no inference from the evidence in any degree indicating that they were not destroyed together. It is, at least, highly probable that the initial explosion embraced the frame building which inclosed both. Nor under the terms of the submission of the case to the jury can the verdict be regarded as establishing that it was negligence on the part of the defendant to keep material for the next mixing in the assembly house. The jury might regard the storage of explosives in the well as negligent, but not the keeping of a small quantity in the assembly house for customary and immediate use. Had that issue been presented, it is impossible to say on appeal what the verdict would have been. In any event, the suggestion that the assembly house was destroyed by the second explosion is the merest speculation. The plaintiff bore the burden of establishing affirmatively that her decedent's death was caused by some act for which the defendant would be liable, not that it might have been so caused. The long-established rule was repeated in the recent case of Laidlaw v. Sage, 158 N. Y. 73, 101, 52 N. E. 679, that:

"When damages claimed in an action are occasioned by one of two causes, for one of which the defendant is responsible, and for the other of which he is not responsible, the plaintiff must fail if his evidence does not show that the damage was produced by the former cause, and the jury must not be left to mere conjecture, and a bare possibility that the damage was caused in consequence of the act of the defendant is not sufficient. Searles v. Railway Co., 101 N. Y. 662, 5 N. E. 66. The plaintiff must fail if the evidence does not show that the injury was the result of some cause for which the defendant is responsible, and, where the proof is by circumstances, the circumstances themselves must be shown, and not left to rest in conjecture, and, when shown, it must appear that the inference sought is the only one which can fairly and reasonably be drawn from the facts. Ruppert v. Railroad Co., 154 N. Y. 94, 47 N. E. 971."

In Babcock v. Railroad Co., 140 N. Y. 308, 35 N. E. 596, the plaintiff's intestate, Bennett, was killed by the explosion of a powder

mill, and the claim of the plaintiff was that the explosion was caused by sparks which escaped from the smokestack of one of the defendant's locomotives. The sole evidence bearing upon the question was that Bennett was seen to enter the building a few moments before the explosion, and that the locomotive was seen approaching emitting smoke, which was carried to and over the building, and as it settled down over the same the explosion occurred. Bennett was the only person in the building. The court said (page 311, 140 N. Y., and page 597, 35 N. E.):

"There was the coincidence of the smoke settling down and the explosion, and also the coincidence of Bennett's entry into the building and the explosion. What caused the explosion,—the sparks in the smoke or some act of Bennett? The jury might guess it was one or the other, and one guess might be more probable than the other, and still it would be a mere guess."

The case of Scandell v. Construction Co., 50 App. Div. 512, 64 N. Y. Supp. 232, does not aid the respondent. There the rule of the authorities was cited with approval, to the effect that when several proximate causes contribute to an accident, and each is an efficient cause, without the operation of which the accident would not have happened, it may be attributed to all or any of the causes; but it cannot be attributed to a cause unless without its operation the accident would not have happened. This rule has no relation to two causes, for one of which the defendant is liable and for the other not, where the accident may have happened by the sole operation of the cause for which there is no liability. The judgment and order should be reversed.

Judgment and order reversed, and new trial granted, costs to abide the event. All concur.