(102 App. Div. 130.)

### OWEN v. RETSOF MINING CO.

(Supreme Court, Appellate Division, Fourth Department. March 1, 1905.)

MASTER AND SERVANT—DEATH BY WRONGFUL ACT—DEFECTIVE APPLIANCES—
EVIDENCE—SUFFICIENCY.

In an action for the death of a servant by the negligence of the master in furnishing an old and weakened cable for use in lowering workmen into a mine, evidence *held* insufficient to justify submission to the jury of the issue of defendant's negligence.

McLennan, P. J., and Williams, J., dissenting.

Appeal from Trial Term, Livingston County.

Action by Addie Owen, as administratrix of Convus Owen, against the Retsof Mining Company. From a judgment for plaintiff, and from an order denying a motion for a new trial, defendant appeals. Reversed.

Argued before McLENNAN, P. J., and SPRING, WILLIAMS, HISCOCK, and STOVER, JJ.

Maulsby Kimball, for appellant.
H. W. Rippey, for respondent.

HISCOCK, J. Plaintiff's intestate was in the employ of the defendant, working in its mines. January 30, 1903, while he was being lowered into one of them, the cable by which was suspended the bucket in which he was riding broke, and he was precipitated to his death at the bottom of the shaft. Plaintiff's action to recover damages from defendant for its alleged negligence in connection with her husband's death rests for its substantial basis upon the claim that the defendant had carelessly allowed the cable to become old, rusty, and weakened, and that this defective condition was the cause of the accident. While there has been some reference upon this appeal to the doctrine of res ipsa loquitur as applicable to such a case as this, it appears to be practically conceded by the counsel for the plaintiff, as is the undoubted fact, that the case was not tried or submitted, and that the judgment cannot be affirmed, under such doctrine. Plaintiff has adopted a course and theory which called upon her to establish, in accordance with the

legal rules ordinarily applicable, that the cable which broke had been negligently allowed to become unfit for use, and that her intestate met his death as the result thereof. When the evidence produced in her behalf is tested by such obligation, I think it is deficient, and that the judgment must be reversed.

There were two shafts leading to defendant's mine, known as No. 1 and No. 2, respectively; the former being regularly and the latter only occasionally used. Upon the day of the accident the intestate undertook to go to the bottom of the mine by the latter. This shaft was 1,000 feet deep. There was used for raising and lowering men and other things an iron bucket, attached to a steel cable. The bucket was of boiler iron, about 3 feet in diameter and 3 or 4 feet deep. It had a bale, which was attached at its upper portion to an iron clevis. To this clevis was attached a heavy iron chain, 2 or 3 feet long, which, in turn, was attached to the cable proper with a loop and iron clamps. Encircling the cable was a rubber buffer, 2 or 3 inches thick. Encircling the cable, and resting upon this buffer, and ordinarily passing up and down the shaft with the bucket, was what was known as a "billy." This was a construction of timbers and planks weighing from three to four hundred pounds, moving in guides upon either side of the shaft, and designed to keep the bucket from swinging as it passed up and down. While this appliance ordinarily moved up and down with the bucket, if it in any manner became stuck or stationary in the shaft while the bucket was being lowered the cable would pass through it, allowing the bucket to descend without the billy. The cable was of steel, and an inch in diameter. At the top of the shaft it passed over a sheave block and drum, and was raised and lowered by an engine. A wire extending the entire depth of the shaft communicated with a bell or hammer in the engine room, and was used to give signals for raising and lowering and stopping the bucket. The intestate, with another man, entered the bucket, and gave the signal for lowering the same. When the latter had reached a depth of 750 feet there came at the same instant a single stroke from this bell wire and a sudden "chug" or strain upon the engine. When the cable was raised, it was found that it had parted at a point within the space covered by the billy in position upon the bucket, and later the bucket and men were discovered in the bottom of the shaft, and the bell wire was found to have broken at a point 50 or 75 feet from the top of the shaft. There was, of course, no eyewitness of the accident.

Plaintiff's evidence permitted the jury to find that this cable had been in use from 10 to 14 years, and that the conditions and its use in the shaft were naturally calculated to produce rust, and especially a damp condition, conducive to rust, where the cable was encircled by the billy. Only one witness, so far as I am able to ascertain, gave evidence intended to show directly that the cable was rusty, as distinguished from the theory that it naturally should become so. He testified that there was more or less rust upon the cable for a distance of about 200 feet from the bucket, and that the end of the cable was in a rusty and impaired condition. This witness, however, testified to observations made eight or nine years before the accident; and, as we interpret its rulings, the court struck out his testimony in regard to

the end of the cable upon the ground that the latter 'had been cut off upon one or two occasions, and that it did not appear that his evidence related to the end in use at the time of the accident. A witness also testified that the cable did not have any "spring" in it, as he had observed in others.

An expert was sworn for the purpose of showing that a cable used as long as the one in question, under the conditions said to prevail, would become defective and unsafe; but a careful analysis of this evidence makes it mean that a cable under some circumstances would last for two years, under others for seven years, and under still others would be good for twenty years, and it minimizes the materiality of the evidence in regard to lack of spring in the cable.

As against this testimony, expert, general, and remote in its character, there is the evidence of witnesses called by the plaintiff herself, and at least one of them no longer in the employ of the defendant, based upon actual observation, to the effect that the cable was kept oiled to prevent rusting, and that the broken end after the accident showed a bright, clean break, free from rust, and the wires in the cable not brittle or impaired. Plaintiff, perhaps, might have met with better fortune in calling witnesses other than those who gave this testimony; but she elected to call them, and must abide by the ordinary rules governing the attitude of a party toward his own witnesses. There is nothing whatever in the appearance of their evidence which makes this rule seem harsh or unjust. One of them, as stated, had absolutely ceased to be connected with or interested in the defendant, and none had any culpable part or connection with the accident. In the face of the positive, direct testimony given as to the good condition of the cable, it is difficult to see how plaintiff has met her burden upon this branch of the case.

We pass to a consideration of the second and remaining point, in respect of which it seems to me plaintiff labors under even more difficulties than upon the first one. Her theory is that, by reason of its defective condition, the cable parted, allowing the bucket to drop as it was being lowered. Two other theories have been suggested of the manner in which the accident may have happened. One is that the billy did not start with the bucket down the shaft, but became stopped in some manner upon the guides; that, after the bucket had been lowered to the depth indicated, the movement and swinging of the cable loosened the billy, and it fell, breaking off the bucket. Still another is that the sudden stopping of the engine when the signal came may have snapped the cable. We shall consider only plaintiff's and the last theory.

The learned trial justice in effect charged, and upon this appeal it must be held, that, if the break was caused by the stoppage and subsequent falling of the billy, no recovery could be had. No negligence is charged against defendant in respect to this appliance, and its cable cannot be said to have been defective because it broke under what would be equivalent to the enormous weight of an appliance weighing three or four hundred pounds falling seven hundred and fifty feet. Plaintiff is bound to point out to us some evidence which permits the legal inference that the accident happened in the manner claimed by her. If the evidence fails to do this, if it indicates with greater or equal probative force that the accident was caused by the dropping of the billy, if it re-

quires in her behalf the substitution of guesswork and conjecture in the place of legal deduction as to whether the accident happened in one or the other of these ways, or in neither of them, she must, of course, fail. This rule is so general and has been so often stated that it is a mere matter of preferring some form of expression.

In Ruppert v. Brooklyn Heights R. Co., 154 N. Y. 90, 93, 47 N. E. 971, 972, it was said:

"It is entirely true that a material fact in a civil or criminal action may be established by circumstantial evidence, but the circumstances must be such as to lead fairly and reasonably to the conclusion sought to be established, and to exclude any other hypothesis fairly and reasonably. It has been said that circumstantial evidence consists in reasoning from facts which are known or proved, in order to establish such as are conjectured to exist, but the process is fatally vicious if the circumstance from which we seek to deduce the conclusion depends itself upon conjecture."

In Babcock v. F. R. Co., 140 N. Y. 308, 311, 35 N. E. 596, 597, it was said:

"There was the coincidence of the smoke settling down and the explosion, and also the coincidence of Bennett's entry into the building and the explosion. What caused the explosion—the sparks in the smoke, or some act of Bennett? The jury might guess it was one or the other, and one guess might be more probable than the other, and still it would be a mere guess. There may be moral evidence, quite convincing and sufficient to influence the conduct of men in some of the ordinary affairs of daily life, which yet does not rise to the standard of legal evidence for the consideration of a legal tribunal, and sufficient to form the basis of judicial action."

The plaintiff simply rests upon the statement that this cable was defective, and that, when the bucket dropped from it, it must or may be assumed that such parting occurred in the ordinary course of lowering, because of this defect. As against this, we have the general fact that the cable and bucket had been repeatedly used for raising much heavier loads without accident, and then we have the other evidence given by plaintiff's witness without contradiction, and therefore to be believed, which seems to me very significant. When the bucket was at the point in the shaft where the break occurred, as the engineer testifies—

"The knocker [the signal bell operated by the wire running down the shaft] knocked once—one tap. There was considerable of a jar came to the engine just about that time." And again: "When I got that signal on the wire I instantly shut off, and waited a couple of minutes. At the same time I got some sort of a jar to my machine. It was practically at the same time. It was kind of a chug." And again: "The jar and the ringing of the knocker was at the same instant. If something struck the bell wire in the shaft anywhere, it would very likely pull it down and ring the knocker then." "The gear wheels [of the engine lowering the cable] gave quite a chug. * * * They gave a kind of a jerk, like that—kind of a jar or chug. I can't explain it any different. * * * Q. Can you tell us whether that chug was such as would have been caused by the striking of a sharp blow upon the bucket or its appurtenances? A. Yes, sir. Q. Was it such a blow? (Objected to.) * * * The Court: If this witness can tell from observation or experience what the effect upon that drum is—or engine—of the sudden relaxation of the engine, he may do so. (Objection overruled and exception.) A. Yes, sir. Q. Can you tell whether there would have been a similar chug, had the cable merely parted, without a sharp blow, and had the bucket dropped under those circumstances? A. Yes; I could tell. Q. Will you tell us? * * * A. I have got knowledge. Q. You may answer? A. I have had ropes break with me when I have been hoisting, and there wasn't any such chug as that."

Plaintiff's witness Bills testified that this cable showed no spring when being operated. The weight of 750 feet of cable hanging down after the bucket dropped prevented any relaxation of tension upon the engine until the cable was nearly all hauled up. The ordinary laws of physics, of which we may take notice, as well as the direct evidence, indicate that, if the cable had parted and the bucket dropped without the application of any extraneous force, there would have been nothing to produce a jar or chug upon the engine. Upon the other hand, if a blow represented by the tremendous violence of a weight of three or four hundred pounds dropping seven hundred and fifty feet was struck upon the top of the bucket, snapping the cable, just such a jerk or jar or chug would be communicated to the engine playing out the cable as was described by the engineer.

It is argued that while at one time ice formed upon the guides, clogging and stopping the billy, this trouble had been remedied, and there is no ground for presuming that the billy stopped, and did not follow the bucket down in the ordinary way. In the absence of evidence, it would be no more violent to presume that this billy, after having operated properly, suddenly became stuck, than to assume that the cable, which had carried much heavier loads, suddenly and without any extra strain parted. But the evidence in regard to the engine indicates a sudden strain somewhere upon the cable, and which, by a process of exclusion, seems to be fully accounted for by the sticking and subsequent falling of the billy. Certainly, as it seems to me, there is more evidence to sustain defendant's theory than that of plaintiff. But of course the appellant is not compelled to submit this appeal to any such measurement. If the evidence may be reconciled equally well with either theory, and compels us to enter into the realm of guesswork in trying to determine which way the accident happened, plaintiff must fail.

The case of Dobbins v. Brown et al., 119 N. Y. 188, 23 N. E. 537, has been called to our attention, as involving an accident in a mining shaft somewhat similar in its general features to this. In that case, as here, the cable broke, and no eyewitness of the accident was left. Plaintiff's theory there was in exact opposition to that maintained here—that the billy had been stopped, and then fallen a great distance, causing the breakage. There was no proof there, as I think there is here, in the movement of the engine, indicating a sudden and violent blow, such as might have been caused by such dropping. That case was as lacking in proof to sustain the theory claimed as this one is to show that the bucket, of its own weight, broke the cable. Under those circumstances, the court said, in language which I think is applicable to the decision of this appeal:

"Any inference that the accident happened in the manner suggested would, it seems to us, have been substituting conjecture for proof, and violating the rule requiring proof always to be made the basis for a recovery."

Various other questions are presented upon the appeal, which it does not seem necessary to consider, in view of the conclusions reached upon the substantial issue involved.

Judgment and order reversed, and new trial granted, with costs to appellant to abide event, upon questions of law and fact. All concur, except McLENNAN, P. J., and WILLIAMS, J., who dissent.